UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

MIRABILIS VENTURES, INC.,                    :          Civil Case No. 05-7905 (RCC)

     Plaintiff,                    :

   -against-                    :          **NOTICE OF MOTION
            TO DISMISS THE
            COMPLAINT**

BRENTWOOD CAPITAL CORPORATION      :
and CHARLES J. SPINELLI, individually,

            :

     Defendants.

-----------------------------------------------------------------x

   **PLEASE TAKE NOTICE** that upon the annexed affidavit of David M. Levy, Esq.,

duly sworn to on the 31st day of May, 2006 and the exhibits annexed thereto, and the accompanying

memorandum of law, defendants Brentwood Capital Corporation and Charles J. Spinelli will move

this Court before the Hon. Richard C. Casey, United States District Judge, at the United States District

Court for the Southern District of New York, located at 500 Pearl Street, New York, New York, for

an order dismissing the complaint in its entirety pursuant to Rules 12(b)(6), 12(b)(7), and 9(b) of the

Federal Rules of Civil Procedure, and for such other and further relief as this court may deem just and

proper.

   **PLEASE TAKE FURTHER NOTICE** that opposing papers, if any, must be served

upon the undersigned on or before June 14, 2006 pursuant to Section 2(d) of the Individual Rules of

Practice Before United States District Judge Richard Conway Casey.

Dated: New York, New York
   May 31, 2006

         LEVY & BOONSHOFT, P.C.

         By: _____
           YOSEF Y. WEINTRAUB(YW 3541)
         Attorneys for Defendants
         477 Madison Avenue, 14th Floor
         New York, New York  10022
         (212) 751-1414

To:    Berman, Kean & Riguera, P.A.
       Attorneys for Plaintiff
       2101 W. Commercial Blvd., Suite 2800
       Fort Lauderdale, Florida 33309

N:\BRENTWOOD\MIRABILIS\NOTICE OF MOTION 05.31.06.wpd

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MIRABILIS VENTURES, INC.,                    :        Civil Case No. 05-7905 (RCC)

                        Plaintiff,           :

            -against-                        :        **AFFIDAVIT OF**
                                                      **DAVID M. LEVY**

BRENTWOOD CAPITAL CORPORATION                :
and CHARLES J. SPINELLI, individually,

                                             :
                        Defendants.
------------------------------------------------------------x

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK)

        DAVID M. LEVY, being duly sworn, deposes and says:

        1.      I am a member of the bar of this Court and of the firm Levy & Boonshoft,

P.C., attorneys for defendants Brentwood Capital Corporation ("Brentwood") and Charles J.

Spinelli.  Based upon a review of the files maintained by our firm relating to this matter and

conversations with the defendants, I am fully familiar with the facts and circumstances herein.  I

respectfully offer this affidavit in support of the defendants' motion to dismiss the complaint in its

entirety.

        2.      Annexed hereto as Exhibit "A" is a true and correct copy of the complaint

filed in this action.

        3.      Annexed hereto as Exhibit "B" is a true and correct copy of the Loan

Agreement entered into by Presidion Solutions, Inc. ("Presidion") and Brentwood.

4.     Annexed hereto as Exhibit "C" is a true and correct copy of the Promissory Note executed by Presidion.

5.     Annexed hereto as Exhibit "D" is a true and correct copy of the Stock and Collateral Pledge Agreement entered into by Presidion and Brentwood.

6.     Based upon the documents annexed herein and the points and authorities cited in the accompanying memorandum of law, defendants' motion to dismiss should be granted in its entirety.

_____
DAVID M. LEVY

Sworn to before me this
31st day of May, 2006

_____
Notary Public

ROBIN MAZZIA
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01MA4726498
QUALIFIED IN QUEENS COUNTY
COMMISSION EXPIRES 6|30|06

N:\BRENTWOOD\MIRABILIS\DML AFF 05.31.06.wpd

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
MIRABILIS VENTURES, INC.,

                    Plaintiff,                     **COMPLAINT**

   -against-

BRENTWOOD CAPITAL CORPORATION     Jury Trial Demanded
 and CHARLES J. SPINELLI, individually,

                 Defendants.
-----------------------------------------------------X

     Plaintiff, MIRABILIS VENTURES, INC. (hereinafter "MIRABILIS"), through its attorneys,

BERMAN, KEAN & RIGUERA, P.A., as and for its complaint against Defendants BRENTWOOD

CAPITAL CORPORATION (hereinafter "BRENTWOOD") and CHARLES J. SPINELLI

(hereinafter "SPINELLI") (collectively "the Defendants") alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for fraud and for rescission of various written agreements entered

    into by Presidion Solutions, Inc.  (hereinafter "Presidion") and Defendants

    Brentwood and Spinelli, to secure certain Irrevocable Letters of Credit, which later

    were discovered to be forged by Defendants Brentwood and Spinelli. Presidion's

    claim against Defendants has been assigned to Plaintiff, Mirabilis, a major

    shareholder in Presidion. Plaintiff now seeks compensatory and punitive damages

    as a result of Defendants' fraudulent actions, including damages for fraud,

    conspiracy and for conversion, and compensatory damages for Defendant

    Brentwood's breach of contract.

## JURISDICTION

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

## VENUE

3.    Venue is proper in the Southern District pursuant to 28 U.S.C. §1391(a)(2) and (a)(3) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District and a substantial part of the property that is the subject of this action is located in the Southern District and because the Southern District is the judicial district where one or more Defendants are subject to personal jurisdiction at the time the action was commenced.

## THE PARTIES

4.    Plaintiff MIRABILIS is a Nevada Corporation with its principal place of business in Orlando, Florida, is suing on behalf of Presidion, a Michigan Corporation with its principal place of business located in Troy, Michigan, as a result of Presidion's assignments of its claims to Mirabilis (collectively "Plaintiff"). Plaintiff entered into various written agreements with Defendants in New York, New York to obtain certain Irrevocable Letters of Credit for its workers compensation insurance programs.

5.    Defendant BRENTWOOD is a New York Corporation with its principal place of business in New York, New York. Brentwood issued the fraudulent Letters of Credit

to Presidion while operating out of its New York, New York office.

6.    Defendant SPINELLI is a individual residing in New Jersey and Chief Executive
      Officer of Brentwood in its New York, New York office.

## FACTS

7.    In October of 2002, Presidion was required to secure Letters of Credit pursuant to
      its worker's compensation insurance policies with Lumberman's Underwriting
      Association (hereinafter "Lumberman's") and First Commercial Insurance Company
      ("First Commercial").

8.    As a result, Presidion was introduced to Brentwood by John Burcham, Presidion's
      former Chairman.

9.    After much discussion and negotiation, on October 15, 2002, Presidion entered into
      various written agreements with Brentwood in New York, New York to secure two
      Letters of Credit.

10.   Presidion issued a Promissory Note to Brentwood in the amount of $5.7 million
      (hereinafter "the Note"), with principal and interest due on the Note within one-year.

11.   The Note was subject to a Loan Agreement (hereinafter "Loan Agreement") and the
      Stock and Collateral Pledge Agreement (hereinafter "Collateral Agreement")
      executed on the same date.

12.   In return for the execution of these agreements, Brentwood provided two one-year
      Irrevocable Letters of Credit for Presidion's worker's compensation insurance
      programs.

13.   One Letter of Credit was issued to Lumberman's for $4.7 million and the other

Letter of Credit was issued to First Commercial for $1 million, totaling $5.7 million. True and correct copies of the Letters of Credit to Lumberman's and First Commercial are attached hereto as Exhibits A and B respectively.

14.    Pursuant to the Note and the Loan Agreement, Presidion agreed to pay Brentwood 7.5% interest in weekly payments of $8,221.16 for the issuance of the $5.7 million Letters of Credit.

15.    Pursuant to the Collateral Agreement, Presidion secured the repayment of the principal amount of the loan by two types of collateral: stock collateral, which was the issued and outstanding shares of Presidion subject to the senior pledge of Comerica Bank, and a Cash Collateral account consisting of Presidion's weekly payments of $109,615, which would result in the entire $5.7 million being paid in one year (hereinafter "the Cash Collateral").

16.    Pursuant to paragraph 3(e) of the Collateral Agreement, the Cash Collateral was to be held in escrow by Brentwood and paid to Presidion as follows:

> Upon satisfaction by Presidion of the terms of the Secured Obligations[1], the Cash Collateral shall be returned to Presidion according to its written instructions.

17.    To date, Presidion has paid $2.3 million into the Cash Collateral escrow account, $172,000 in interest and a commitment fee of $570,000 (10% financing charge on the entire face value of the Letters of Credit) for total payments of approximately $3 million received by Brentwood.

---

[1] Pursuant to paragraphs 3(d) of the Collateral Agreement, the terms of the Secured Obligations consist of payment of the principal and weekly interest payments at the end of the one year term pursuant to paragraph 2.1 of the Loan Agreement.

18.     The Letters of Credit were drafted by Brentwood, through Spinelli, who issued them on Bank of the West letterhead for the benefit of Lumberman's and First Commercial.

19.     The Letters of Credit, however, were not honored by Bank of the West because the Defendants had forged the signatures of the banks' representatives and the Letters of Credit were prepared without the authority, knowledge or agreement of the Bank of the West.

20.     As a result of the fraudulent Letters of Credit issued by Brentwood and Spinelli, Presidion had to incur additional expenses to replace the Letters of Credit required by Lumberman's and First Commercial.

21.     In February, 2003, Presidion marked the Letters of Credit void and cancelled and returned the full face value of the Letters of Credit to Brentwood, not drawn upon, demanding return of the $2.3 million Cash Collateral.

22.     Brentwood and Spinelli, however, have refused to return the Cash Collateral to Presidion despite the fact that the Letters of Credit were fraudulent and that Lumberman's and First Commercial were unable to draw against them.

23.     In March of 2003, Presidion attended a meeting in Miami, Florida, with Brentwood to discuss the return of the $2.3 million Cash Collateral.

24.     John Burcham, on behalf of Presidion, and Defendant Spinelli, representing Brentwood, were in attendance at that March 2003 meeting.

25.     At that meeting that Spinelli stated that Brentwood would not return the $2.3 million Cash Collateral to Presidion.

26.  Subsequent to that meeting and for approximately the next 14 months, Presidion and CSRV, an entity affiliated with Brentwood, entered into negotiations for CSRV to acquire Presidion.

27.  During the merger discussions, the issue of the $2.3 million Cash Collateral was put on hold.

28.  In fact, Anthony Huff, a representative of CSRV told Burchan, the former Chairman of Presidion, that there was no need to continue to discuss the issue of the $2.3 million Cash Collateral because "the money would just be in the family."

29.  The merger discussions, however, broke off in the summer of 2004.

30.  At that time, Presidion demanded the return of the deposit with no response from Brentwood.

31.  Mirabilis now owns and holds the Presidion shares originally held by Burcham and is a major shareholder of Presidion.

32.  Mirabilis has entered into an assignment with Presidion for its claims against Brentwood and Spinelli and is now the real party in interest of these claims.

## FIRST CAUSE OF ACTION FOR FRAUD

33.  Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 32 above as if fully set forth herein.

34.  The foregoing material representations of fact made by Defendants and reasonably relied upon by Plaintiff were false and known to be false when made by Defendants.

35.  Plaintiff entered into the Note, the Loan Agreement and the Collateral Agreement to obtain the Letters of Credit from Brentwood, based upon Defendants'

representations and warranties to Plaintiff that Brentwood and Spinelli would provide Presidion with legal and valid Letters of Credit as required by Lumberman's and First Commercial for Presidion's worker's compensation insurance policies.

36. Plaintiff reasonably relied on Brentwood and Spinelli to provide legal and valid Letters of Credit for Plaintiff's use and Brentwood and Spinelli made material representations of fact that the Letters of Credit were legal and valid.

37. Moreover, Plaintiff entered into the Collateral Agreement and deposited $2.3 million in an escrow account controlled by Brentwood and approximately $800,000 in interest and fees to secure the Letters of Credit, which were later discovered by Plaintiff to be forged by the Defendants, because Plaintiff reasonably relied on Defendants to provide valid and legal Letters of Credit.

38. The Defendants' actions were intentional, wilful and malicious and without legal justification.

39. As a result of the foregoing, Plaintiff suffered damages.

**SECOND CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT**

40. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 32 above as if fully set forth herein.

41. The foregoing material representations of fact made by Defendants and reasonably relied upon by Plaintiff were false and known to be false when made by Defendants.

42. Plaintiff was induced by Defendants to enter into the Note, the Loan Agreement and the Collateral Agreement to obtain the Letters of Credit from Brentwood, based upon Defendants' representations and warranties to Plaintiff that Brentwood and Spinelli

would return the $2.3 million Cash Collateral when the $5.7 million principal amount was paid to Brentwood.

43. Plaintiff reasonably relied on the material statements of fact made by Spinelli that Brentwood and Spinelli would return the $2.3 million Cash Collateral when the $5.7 million of Letters of Credit were cancelled and returned to Brentwood, which were known to be false when made.

44. The false statements of material fact was intentional, wilful and malicious and without legal justification but emanated from Defendants for the express purpose of inducing Plaintiff to rely thereon and Presidion did in fact reasonably relied thereon when entering into the transaction with Brentwood and Spinelli.

45. Plaintiff would not have executed the Note, the Loan Agreement and the Collateral Agreement had Plaintiff known the truth of all relevant and material facts related to the transaction.

46. As a result of the foregoing, Plaintiff suffered damages.

## THIRD CAUSE OF ACTION FOR BREACH OF CONTRACT

47. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 32 above as if fully set forth herein.

48. On or about October 15, 2002, Plaintiff and Brentwood entered into the Note, the Loan Agreement and the Collateral Agreement.

49. Pursuant to the terms and conditions of the Note, the Loan Agreement and the Collateral Agreement, Brentwood was obligated to provide Plaintiff with Letters of Credit worth $5.7 million if Plaintiff deposited $2.3 million into a collateral account

Page 8 of 11

and paid approximately $800,000 in interest and fees to Brentwood.

50.     Defendant Brentwood breached the Note, the Loan Agreement and the Collateral

Agreement by providing invalid Letters of Credit and by refusing to return the Cash

Collateral after the Letters of Credit when requested by Plaintiff pursuant to sections

3(d) and 3(e) of the Collateral Agreement.

51.     All conditions precedent to the filing of this action have occurred, been waived or

performed.

52.     As a result of the foregoing, Plaintiff suffered damages.

### FOURTH CAUSE OF ACTION FOR CONVERSION

53.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 32

above as if fully set forth herein.

54.     Defendant Brentwood and Spinelli have converted to their own use the $2.3 million

Cash Collateral and $800,000 in interest and fees, which was and is the exclusive

property of the Plaintiff.

55.     As a result of the foregoing, Plaintiff suffered damages.

### FIFTH CASE OF ACTION FOR CIVIL CONSPIRACY
### TO COMMIT FRAUD AND CONVERSION

56.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 32

above as if fully set forth herein.

57.     Upon information and belief, Beginning in October of 2002, Spinelli conspired with

Brentwood to commit a fraud upon Plaintiff by forging Bank of the West officers'

signatures on documents prepared by Defendants to serve as Plaintiff's Letters of

Credit in hopes that the Letters of Credit would expire in the one- year before they

were drawn upon and before Plaintiff ever discovered the fraudulent signatures.

58.     Defendants also conspired to retain the Cash Collateral paid by Plaintiff for the fraudulent Letters of Credit.

59.     There is no legal basis for Defendants to retain Plaintiff's $2.3 million Cash Collateral pursuant to the Collateral Agreement and has unlawfully retained same.

60.     As a result of the foregoing, Plaintiff suffered damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

1.     Rescission of the Loan Agreement and the Collateral Agreement and cancel the Note, including all guarantees, between Plaintiff and Defendant Brentwood dated October 15, 2003 and to restore the Plaintiff to *status quo*.

2.     Compensatory, consequential and incidental damages in the amount to be fixed at trial but not less than THREE MILLION FORTY TWO THOUSAND DOLLARS ($3,042,000) for the first through fifth cause of action against Defendant Brentwood and for the first, second, fourth and fifth cause of action against Defendant Spinelli.

3.     Punitive damages in an amount to be fixed at trial by reason of wanton, willful and malicious character of the conduct complained of on the first, second, fourth and fifth causes of action against Defendants Brentwood and Spinelli.

4.     An award of costs and disbursements to Plaintiff.

5.     Such other and further relief as this Court may deem just, proper and equitable.

Dated: September 6, 2005

                              Respectfully,


                         Page 10 of 11

BERMAN, KEAN & RIGUERA, P.A.

By:_____
           Richard E. Berman   (RB-2715 )
           Brian J. McCarthy    (BM-4161)
           2101 W. Commercial Blvd, Suite 2800.
           Fort Lauderdale, FL 33309
           Telephone: (954) 735-0000
           Facsimile: (954) 735-3636

\\Server-01\REBData\Amodeo, Frank\1310-029\Style\7750.wpd

# EXHIBIT B

# LOAN AGREEMENT

This LOAN AGREEMENT ("Loan Agreement") is entered into as of the 22nd day of October, 2002 (the "Effective Date") by Presidion Solutions, Inc., a Michigan corporation ("Presidion") and Brentwood Capital Corp., a New York corporation ("Brentwood").

## INTRODUCTION

**WHEREAS,** Presidion has requested that Brentwood procure, on behalf of Presidion, a letter of credit in the principal amount of $5,700,000 for the purposes set forth in Section 7.1.1 hereof (the "LOC"); and

**WHEREAS,** Brentwood is willing to procure such letter of credit on the terms and conditions contained in this Loan Agreement; and

**WHEREAS,** the amount advanced by Brentwood to Presidion pursuant to this Loan Agreement shall be used by Presidion solely to extend the terms of Presidion's workers' compensation insurance policy under the terms and conditions specified in this Loan Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Brentwood to procure the LOC, Presidion and Brentwood hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS

Section 1.1 Definitions and Exhibits. Terms defined above or in the text of this Loan Agreement shall have the meanings set forth herein and below. All exhibits to this Loan Agreement are also incorporated herein.

"Advance" means the advance of Loan proceeds on the Closing Date.

"Arising Out Of" means directly or indirectly arising out of, relating in any manner to, arising in connection with, growing out of or stemming from, or in any manner caused by or resulting from, whether by action or inaction and whether such action or inaction be culpable and whether such action be in contract, tort or otherwise.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, or (ii) a day on which commercial banks in New York City are authorized or required by law or executive order to close.

"Capital Lease Obligations" means, with respect to any Person, the   obligation of   such

Person to pay rent or other amounts under any lease with respect to any property (whether real, personal or mixed) acquired or leased by such Person that is required to be accounted for under GAAP as a liability on a consolidated balance sheet of such Person.

"Claims" means any and all administrative, legal or other actions, claims, suits, appeals, settlements, consent decrees, or investigations.

"Closing" or "Closing Date" shall mean the last to occur of: (a) the date the Loan Agreement and the Related Documents are executed and delivered to Brentwood; and (b) the date all conditions precedent contained in Section 5.1 of the Loan Agreement are satisfied.

"Collateral" shall mean a certificate or certificates representing an aggregate of all of the issued and outstanding shares of Presidion's common stock, registered in the name of John W. Burcham, II, James E. Baiers and Craig Vanderburg and accompanied by a stock power endorsed in blank with Medallion signature guaranteed, which collateral shall be subordinate to the pledge to Comerica Bank.

"Consent" means a written document containing the approval of and executed by the Person to be bound by the document.

"Contractual Obligation" means, with respect to any Person, each provision of this Loan Agreement, each Related Document, and all provisions of all other agreements, contracts, instrument and undertakings to which such Person is a party or by which it or any of its property is bound.

"Costs and Fees" means all reasonable out-of-pocket or incurred costs (including without limitation those incurred by the following persons) and expenses of every nature, including, without limitation, reasonable attorneys' fees (whether of independent or in-house counsel whether incurred before trial, at trial, or appeal and in any bankruptcy or arbitration proceeding), reasonable fees of paralegals, clerks, accountants and other consultants or experts, and of collection and other agents, and all other reasonable fees, costs and expenses of every nature whatsoever now or hereafter incurred from time to time, including, without limitation, all reasonable expenses related to the Collateral (including without limitation, all appraisal(s), filing and recording fees).

"Default" or "Event of Default" has the meaning set forth in Section 8.1 of the Loan Agreement.

"Default Rate" has the meaning set forth in Section 4.2 of the Loan Agreement.

"Effective Date" has the meaning set forth in the preamble of the Loan Agreement.

"GAAP" or "Generally Accepted Accounting Principles" means generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Body" means any foreign or domestic government; court; federal, state, county, municipal or other department, commission, board, bureau, agency, administrator, public authority or instrumentality; arbitrator; mediator; or other governmental regulator or authority.

"Guarantees" means the Guaranty, dated the Closing Date, between Brentwood and John W. Burcham, II, James E. Baiers and Craig Vanderburg, in the form attached as Exhibit D hereto.

"Indebtedness" means, with respect to any Person, (i) all obligations of such Person for borrowed money or for the deferred purchase price of property or services (including all obligations, contingent or otherwise, of such Person in connection with letters of credit, bankers' acceptances, or other similar instruments, including currency swaps) other than indebtedness to trade creditors and service providers incurred in the ordinary course of business and payable on usual and customary terms, (ii) all obligations of such Person evidenced by bonds, notes, debentures or other similar instruments, (iii) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the remedies available to the seller or lender under such agreement are limited to repossession or sale of such property), (iv) all Capital Lease Obligations of such Person, (v) all obligations of the types described in clauses (i), (ii), (iii) or (iv) above secured by (or for which the obligee has an existing right, contingent or otherwise, to be secured by) any Lien upon or in any property (including accounts, contract rights and other intangibles) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (vi) all preferred stock issued by such Person which is redeemable, prior to full satisfaction of Presidion's obligations under this Loan Agreement and the Notes, other than at the option of such Person and (vii) all Indebtedness of any partnership of which such Person is a general partner.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Lien" or "Liens" means, with respect to any Person, any security interest, pledge, mortgage, charge, option, assignment, hypothecation, encumbrance, attachment, garnishment, sequestration, forfeiture, execution or other voluntary or involuntary lien upon or affecting the revenues of such Person or any real or personal property in which such Person has or hereafter acquires any interest, except (i) Liens for Taxes which are not delinquent or which remain payable without penalty or the validity or amount of which is being contested in good faith by appropriate proceedings and reserves Consented to by Brentwood; (ii) Liens imposed by law (such as mechanics' liens) incurred in good faith in the ordinary course of business which are not delinquent or which remain payable without penalty or the validity or amount of which is being contested in good faith by appropriate proceedings and reserves consented to by Brentwood; and (iii) deposits or pledges under workmen's compensation, unemployment insurance, social security, bids, tenders,

contracts (except for repayment of borrowed money), or leases, or to secure statutory obligations or surety or appeal bonds or to secure indemnity, performance or other similar bonds given in the ordinary course of business.

"Loan" or "Loans" means the loan from Brentwood to Presidion in the original principal amount of $5,700,000 made pursuant to the Loan Agreement and as the Loan may be extended, modified or renewed from time to time.

"Loan Agreement" means this Loan Agreement, as the same may be amended, extended or renewed from time to time.

"Loan Documents" means the Related Documents.

"Loss" or "Losses" means any and all Costs and Fees, losses, liabilities, deficiencies, obligations, damages and other expenses of every nature, including without limitation interest and penalties.

"Material Adverse Effect" means an adverse effect upon the business, financial condition, results of operations, property, assets or prospects of Presidion or the Subsidiaries, or upon the validity or enforceability of the Loan Agreement or any of the other Related Documents, or upon the collectibility of the Loan, or upon the Contractual Obligations or ownership of Presidion of the Collateral or Brentwood's Lien thereon, or upon the ability of Presidion to perform its obligations hereunder or under any Related Document, or upon the rights of Brentwood hereunder or under any Related Document, which adverse effect would be viewed as material by a reasonably prudent lender.

"Maturity Date" has the meaning given that term in Section 3.1 of the Loan Agreement.

"Note" means the promissory note in substantially the form attached as Exhibit A and any other promissory note now or hereafter evidencing an Advance, all as extended, renewed or amended from time to time.

"Obligations" means all obligations for principal or interest on the Notes, all Costs and Fees, all indemnification obligations and all other amounts of every nature whatsoever due or to become due Brentwood under this Loan Agreement or under any Related Document.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization, including a state, government or political subdivision or an agency or instrumentality thereof.

"Permitted Liens" means each of the Liens described on Schedule 5.1(a) hereto, and any extensions, renewals or modifications of such liens provided that the Indebtedness secured by such Liens (if to other than Brentwood) is not increased in connection with any such renewals, extensions or modifications of such Liens.

"Principal Amount" has the meaning set forth in Section 2.1 of the Loan Agreement.

4

"Related Documents" means the Loan Agreement, Notes, Security Agreement, the Guarantees and UCC's and all other certificates, documents or agreements now or hereafter Arising Out Of or executed in connection with or pursuant to any of the foregoing.

"Requirement of Law" means, with respect to any Person, the now or hereafter existing articles or certificate of incorporation and bylaws, the partnership or limited liability company agreement or other organizational or governing documents of such Person, and any law, treaty, rule, order, judgment, decree, injunction, writ, or regulation, or a final and binding determination of an arbitrator, mediator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Security Agreement" means that certain Stock and Collateral Pledge and Security Agreement, dated the Closing Date, between the parties in the form attached as Exhibit E.

"Subsidiaries" means the entities set forth on Exhibit S hereto.

"Taxes" means for any Person any federal or state tax, assessment, duty, levy, withholding liability, impost and other charges of every nature whatsoever imposed by any Governmental Body on such Person or on any of its property or because of any, revenue, income, sales, use, product, employee or franchise, and any interest or penalty with respect to any of the foregoing.

"UCC's" means the Uniform Commercial Code financing statements executed and filed at the closing of the loans by Brentwood to Presidion pursuant to the Loan Agreements.

## ARTICLE 2.
## THE COMMITMENT

Section 2.1 Term Commitment.  Subject to the terms and conditions of this Loan Agreement, Brentwood agrees to make a loan on the Closing Date to Presidion by providing the LOC in favor of Presidion in the principal amount of $5,700,000 (the "Principal Amount").  The Loan shall bear interest as provided in this Loan Agreement. The Loan shall be evidenced by the Notes, the Collateral Pledge and Security Agreement, the Guaranty and this Loan Agreement.

Subject to the conditions set forth in this Loan Agreement, Brentwood shall disburse the Loan by releasing the LOC to Presidion, exclusive of fees and disbursements in connection with this Loan Agreement

Section 2.2 Evidence of Indebtedness. Brentwood shall maintain records evidencing amounts of principal and interest paid by or on behalf of Presidion to Brentwood hereunder.  The books and records of Brentwood shall be prima facie evidence, absent manifest error, of all amounts of principal, interest, Costs and Fees, outstanding or repaid pursuant to this Loan Agreement or any Related Document.

ARTICLE 3.
REPAYMENT, INTEREST AND ACCELERATION

Section 3.1 Payment of Interest.  Interest upon the Principal Amount shall be repaid to Brentwood in fifty-two (52) equal weekly installments of Eight Thousand Two Hundred Twenty-One and 16/100 dollars ($8,221.16), commencing October 22, 2002, and continuing to and including October 15, 2003, or until repaid or otherwise fully satisfied (the "Maturity Date"). All accrued but unpaid interest, Costs and Fees, shall be due and payable one calendar year following the Closing Date. The principal, interest and other sums due on the Notes or under the Loan Agreement shall be reflected by Brentwood's records which will be prima facie evidence of the computation of the amounts owing by Presidion to Brentwood, absent manifest error.

Section 3.2 Interest Rate, Interest Compounding, Outstanding Principal Balance. Interest on the outstanding Principal Amount shall accrue at seven and one-half percent (7.5%) per annum, based on a year of 365 days and actual days elapsed.  Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Notes shall accrue at the Default Rate specified in Section 4.2 hereof and shall be compounded every 90 days following the Closing Date.  Presidion may, at its election, from time to time prior to the Maturity Date, pay accrued and unpaid interest in cash. All accrued but unpaid interest shall be due and payable on the Maturity Date, at Brentwood's election, (i) in cash or (ii) as set forth in Section 3.5 hereof.  All accrued but unpaid interest shall be added to the outstanding principal balance.  If it is ever determined that the rate of interest was in excess of any maximum rate (if any) prescribed by law, then that portion of interest payments representing any amounts in excess of said maximum shall be deemed a payment of principal and applied by Brentwood at any time against principal.

Section 3.3  Prepayment.  The Loan may be prepaid at any time or from time to time in whole or in part without prepayment fee, premium or penalty. Any prepayment shall first be applied to Costs and Fees, if any, described in Section 4.1, then to accrued interest and then to principal, or in such other order as Brentwood may, in its sole discretion, determine.

Section 3.4 Acceleration.  In the event of any draw down or attempted draw down of all or a portion of the LOC by any Person, the full Principal Amount, together with all accrued interest, Costs and Fees shall immediately become due and owing pursuant to the terms and conditions set forth in the Note.

Section 3.5 Manner, Method, Place, Time and Application of Payment, Reinstatement, Waivers.  All Obligations shall be paid in lawful currency of the United States and in immediately available funds to Brentwood by wire transfer in immediately available funds to such bank account as Brentwood or any assignee may designate in writing. The liability of Presidion hereunder and under any Related Document shall be reinstated and revived

6

and the rights of Brentwood shall continue to the extent of any amount at any time paid by or on behalf of Presidion if such amount shall thereafter be required to be restored, returned or forfeited by Brentwood pursuant to any Requirement of Law, and Presidion's liability therefor shall continue as if such amount had not been paid.

Presidion agrees that if for any reason any amount due hereunder or under any Related Document is paid by cashier's, certified teller's or other check, there shall be no discharge of Presidion's obligation until said check be finally paid by the issuer thereof.

All payments under this Loan Agreement shall be made without counterclaim, set-off, condition or qualification and free and clear of (and without deduction for) any Taxes, deductions or charges of any nature whatsoever and irrespective of any default by Brentwood under this Loan Agreement or any Related Document. All payments (other than prepayments which shall be applied as specified in the preceding Section 3.3) shall be applied first indemnities and all amounts due hereunder other than principal and interest, then against interest due on amounts in default, then against interest due on amounts not in default, and then against principal.

## ARTICLE 4.
## OTHER PAYMENTS AND FEES

Section 4.1 Costs and Fees. Upon demand therefor, Presidion agrees to pay to Brentwood all Costs and Fees Arising Out Of: the performance of this Loan Agreement and any other Related Document; the renewal, modification, extension, forbearance (if any), refinancing, renegotiations or restructuring of this Loan Agreement or any Related Document; collecting any and all Obligations; protecting, preserving and realizing upon any Collateral or other security for such amounts; and/or enforcing this Loan Agreement or any Related Document. The Costs and Fees due hereunder are part of the Obligations and are secured by the Liens granted by Presidion to Brentwood pursuant to the Security Agreement and guaranteed pursuant to the Guarantees.

Section 4.2    Calculations; Default Interest; Compounded Interest. Except as otherwise expressly set forth in this Loan Agreement, all computations of interest and fees under this Loan Agreement or any Related Document shall be made on the basis of a year consisting of 365 days and actual days elapsed. All amounts that are not paid when due under this Loan Agreement shall bear interest at the interest rate of fifteen percent (15%) per annum (the "Default Rate"), compounded every 90 days after the Default Rate becomes applicable until the default is cured.

Section 4.3 Origination Fees. Presidion agrees to pay to Brentwood, on or before the Closing Date, as a condition to Closing, the sum of $570,000 in connection with Brentwood's efforts to procure the LOC (the "Origination Fee"). The Origination Fee shall be non-refundable and paid in lawful currency of the United States and in immediately available funds to Brentwood by wire transfer in immediately available funds to such bank account as Brentwood or any assignee may designate in writing.

ARTICLE 5.
CONDITIONS TO LENDING, SECURITY
AND OTHER COVENANTS

Section 5.1 Conditions. The obligation of Brentwood to make the Loan is subject to fulfillment by Presidion of all of the following conditions:

(a) Presidion shall have delivered the Origination Fee as set forth in Section 4.3.

(b) Execution and delivery by Presidion or its Subsidiaries, as applicable, of this Loan Agreement, Security Agreement, the Note, UCC's, Guarantees and all other executed Related Documents.

(c) The representations and warranties contained in Article 6 hereof and in each Related Document shall be correct and accurate in all material respects on and as of Closing as though made on and as of such date and no Event of Default and no condition or event which, with the giving of notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing on Closing and Brentwood shall have received a certificate in the form set forth on Exhibit B attached hereto and signed by the President of Presidion, dated as of the Closing Date, to that effect.

(d) Presidion shall have complied in all material respects with all covenants and obligations to be performed or observed by it at or prior to such time, including but not limited to those set forth in the Loan Agreement.

(e) Presidion shall have obtained all consents of third parties, including, without limitation, any Governmental Body, required in connection with the execution and delivery of this Loan Agreement and the Related Documents and consummation of the transactions contemplated hereby and thereby.

(f) Brentwood shall have received an executed certificate in substantially the form of Exhibit C.

(g) Brentwood shall have received copies of all corporate action taken by Presidion and its Subsidiaries to authorize this Loan Agreement, the Related Documents, the borrowings hereunder and the Note, certified as of the Closing Date by the Secretary of Presidion.

(h) There shall not be pending or threatened any action or proceeding before any court or administrative agency relating to the transactions contemplated by this Loan Agreement or the Related Documents which could reasonably be expected to materially impair the ability of Presidion to perform its obligations under this Loan Agreement or under the Related Documents.

(j) Brentwood shall have received such other documents as Brentwood may reasonably request.

Section 5.2   Conditions Not Fulfilled.  If the above conditions are not fulfilled or if the Loan or any portion thereof is not made because of such nonfulfillment of conditions, neither Brentwood nor Presidion shall be responsible to each other or any other Person for any Loss Arising Out Of nonfulfillment of the above conditions or a failure to make the Loan.  If Brentwood is unable to perform its obligations under this Agreement, then the Origination Fee and any payments of Collateral and interest shall be returned to Presidion.

Section 5.3  Security.  As security for the prompt payment and performance of all Obligations, Presidion is concurrently granting to Brentwood a Lien in all collateral described in the Security Agreement.

ARTICLE 6.
REPRESENTATIONS, WARRANTIES AND COVENANTS

Section  6.1  Representations,  Warranties  and  Covenants  of  Presidion.  The warranties, representations, and covenants contained in this Loan Agreement and in any Related Document shall be deemed to have been relied upon by Brentwood and shall survive the Closing and continue until all Obligations have been paid in full.

Presidion hereby represents, warrants, covenants and agrees with Brentwood that:

Section 6.1.1. Good Standing and Power.   Presidion and its Subsidiaries are corporations, each duly organized and existing, in good standing, under the laws of the jurisdiction of its incorporation, and each has the corporate power to own its property and to carry on its business as now being conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it therein or in which the transaction of its business makes such qualification necessary, except for failures to be in good standing or qualified that would not in the aggregate have a Material Adverse Effect.

Section 6.1.2. Corporate Authority.  Presidion has full corporate power and authority to enter into this Loan Agreement, and the Security Agreement, to grant to Brentwood the Liens described therein, to make the borrowings contemplated hereby, to execute and deliver the Note and to incur the Obligations provided for herein and therein, all of which have been duly authorized by all proper and necessary corporate action.  Each of the Subsidiaries has full corporate power and authority to enter into the Guaranty to which it is a party, to grant to Brentwood the Liens described therein and to incur the Obligations provided for therein.  No consent or approval of stockholders or of any Governmental Body is required as a condition to the validity or performance by Presidion of this Loan Agreement or any Related Document.

9

Section 6.1.3. Authorizations. All authorizations, consents, approvals, registrations, exemptions and licenses with or from Governmental Bodies which are necessary for the borrowings hereunder, the grant of the Liens on the Collateral, the execution and delivery by Presidion or the Subsidiaries of this Loan Agreement, the Security Agreement, the Notes and the Guarantees and the performance by Presidion and its Subsidiaries of their respective Obligations hereunder and thereunder have been effected or obtained and are in full force and effect.

Section 6.1.4. Binding Agreement. This Loan Agreement and the Related Documents constitute the valid and legally binding obligations of Presidion and its Subsidiaries, as applicable, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and, as to enforcement, to general equity principles.

Section 6.1.5. Litigation. Except as described in Exhibit F attached hereto, there are no proceedings or investigations pending or, so far as the officers of Presidion know, threatened before any court or arbitrator or before or by any Governmental Body which, in any one case or in the aggregate, if determined adversely to the interests of Presidion or a Subsidiary, would have a Material Adverse Effect.

Section 6.1.6. No Conflicts. There is no statute, regulation, rule, order or judgment, and no provision of any mortgage, indenture, contract or agreement binding on Presidion or any of its Subsidiaries or affecting their properties which would prohibit, conflict with or in any way prevent the execution, delivery, or carrying out of the terms of this Loan Agreement and the Related Documents.

Section 6.1.7. The Security Agreement. The provisions of the Security Agreement will be effective to maintain in favor of Brentwood a valid, binding and enforceable, security interest or lien in all right, title and interest of Presidion in all material parts of the Collateral, and shall constitute a first priority, perfected security interest or lien in all right, title and interest of Presidion in all material parts of such Collateral.

Section 6.1.8 The Collateral. All shares of Presidion representing the Collateral are duly and validly issued, fully paid and non assessable.

## ARTICLE 7.
## FURTHER COVENANTS

Section 7.1 Covenants. Until principal and interest on the Loan is paid in full, or deemed satisfied, Presidion hereby covenants and agrees that unless Brentwood otherwise consents, Presidion shall:

Section 7.1.1. Use of Proceeds. Presidion shall use the Loan proceeds solely to deliver claims collateral funds for the benefit of Presidion's workers' compensation insurance policy.

Section 7.1.2 No Encumbrances. There are no liens, judgments, pledges or other encumbrances against the Collateral; and no attempted hypothecation of the Collateral will be made by any person.

Section 7.1.3. Notices. To the extent known to Presidion, promptly give written notice to Brentwood of the occurrence of any material development in, (a) any Event of Default or any event which, upon a lapse of time or notice or both, would become an Event of Default; (b) any material Claim or other dispute of any nature whatsoever concerning, or any change in any Requirement of Law, adversely affecting or relating to, Presidion, or (c) any event or circumstance that could reasonably be expected to have a Material Adverse Effect.

Section 7.1.4. Compliance with Laws. Conduct its operations and cause those of its Subsidiaries to be conducted, and use the Collateral, only in compliance with all policies of insurance and all Requirements of Law, except where any failure could not reasonably be expected to have a Material Adverse Effect.

Section 7.1.5. Maintenance of Records. Maintain adequate and complete records and books of account in accordance with GAAP, which books shall reflect all financial transactions of Presidion. Presidion shall also permit any of Brentwood's representatives upon reasonable request and during normal business hours to visit and inspect any of the properties of Presidion, to examine all its books of account, records, reports and other papers and to make copies and extracts therefrom. Upon reasonable request, Brentwood may also conduct a periodic audit of Presidion's accounts receivable and inventory at Brentwood's expense. In addition, Presidion shall also permit any of Brentwood's representatives to discuss its affairs, finances and accounts with its officers, employees and independent public accountants (and by this provision Presidion authorizes said accountants to discuss the finances and affairs of Presidion with Brentwood or its accountants or other agents) all at such reasonable times and as often as may be reasonably requested.

Section 7.1.6. Indemnification. Indemnify, defend and hold harmless Brentwood from and against any and all Claims (whether known or unknown and whether now or hereafter existing) Arising Out Of (a) any inaccuracy when made of any representation or warranty contained in this Loan Agreement or any Related Document or any breach by Presidion of any covenant or agreement in this Loan Agreement or any Related Document; and (b) the performance, enforcement (including affirmative suits and the defense of any Claim or liability whatsoever) and collection of this Loan Agreement or any Related Document. Notwithstanding the foregoing, Presidion shall not be required to indemnify, defend or hold harmless Brentwood for any Claims or Losses directly and actually caused by the gross negligence or willful misconduct of Brentwood. Nothing in this section is intended to limit or shall limit any obligation of Presidion to Brentwood, including but not limited to the repayment obligations of Presidion contained in Article 3.

11

Section 7.1.7.    Preservation of Existence and Property.    Preserve and maintain its existence in the jurisdiction of its formation and qualify, and cause its Subsidiaries to qualify, and remain qualified, and cause each of its Subsidiaries to remain qualified, as a foreign corporation in each jurisdiction where the failure to so qualify could have a Material Adverse Effect.    Presidion shall take all reasonable action to maintain all rights, privileges and franchises necessary or desirable to the normal conduct of its business, and shall comply and cause each of its Subsidiaries to comply with all Contractual Obligations and Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, have a Material Adverse Effect.

Section 7.1.8. Incurrence of Indebtedness.  Presidion shall not create, incur, assume or suffer to exist any Indebtedness, or permit any of its subsidiaries so to do, except (i) Indebtedness to Brentwood, (ii) Indebtedness of Presidion (or its successor) to others that is subordinated by a written agreement satisfactory in form and substance to Brentwood to all Indebtedness of Presidion (or its successor) to Brentwood and (iii) Indebtedness of Presidion or the Subsidiaries outstanding on the date hereof.

Section 7.1.9  No Dilution.  So long as the Loan shall remain unpaid: (i) no additional shares of Presidion's common stock shall be originally issued; and (ii) Presidion shall not create or issue any additional classes of debt or equity securities convertible into common stock

Section 7.1.10 Standstill. So long as the Loan shall remain unpaid, Presidion shall not, without the prior written consent of Brentwood: (i) make any acquisition of assets or stock or otherwise consummate any business combination, the consummation of which would adversely impact Presidion's ability to perform its obligation under this Agreement; (ii); create any material amount of indebtedness except in the ordinary course of business (iii) sell, dispose or purchase any material amount of assets or expend a material amount of funds except in accordance with the agreed upon schedule of use of proceeds; (iv) declare any dividends; (v) pay any pension or severance pay to any executive officer; (vi) repay any loans made by members of management or their families; (vii) make payment toward any accrued but unpaid wages presently on the books of Presidion for members of management or their families which are not more mature than one (1) pay period; (viii) enter into any employment or other compensation agreement or arrangement with any employee providing for annualized base compensation in excess of $110,000; or (ix) renew or extend or modify any management employment agreement or enter into new employment agreement with its officers and directors except on such terms and conditions as shall have been approved and agreed upon in advance.

## ARTICLE 8.
## EVENTS OF DEFAULT

Section 8.1  Events  of  Default; Acceleration and Remedies. Without  regard  to previous knowledge or any forbearance by Brentwood, the following shall be defaults under this  Loan Agreement and the terms "Event of Default", "default" or "Default" shall mean any one or more of the following events:

(a) Payment Default. Presidion shall fail to pay or cause to be paid when due any portion of any Obligation and any such failure shall remain unremedied for three (3) days; or

(b) Loss of Insurance.  Presidion is unable to obtain workers' compensation insurance coverage for any period of time; or

(c) Loss of PEO License.  Presidion, its Subsidiaries or Affiliates shall no longer obtain a license to operate as a Professional Employment Organization in any jurisdiction in which it is necessary to have a license to do so; or

(d) Breach of Other Covenants or Failure of any Condition.  Presidion shall fail to perform, keep or observe any provision not involving a payment obligation of this Loan Agreement, contained in this Loan Agreement and any such failure shall remain unremedied for thirty (30) days after written notification thereof shall have been given to Presidion by Brentwood; or

(e) Breach of Representation or Warranty. Any representation or warranty made by Presidion under or in connection with this Loan Agreement or any Related Document shall prove to have been untrue or misleading when made or becomes untrue in any material respect; or

(f) Breach of Section 7.1.1 Any failure to comply with the preceding Section 7.1.1; or

(g)  Cross Defaults. Any obligation (other  than  its  obligation  hereunder) of Presidion  or any of its Subsidiaries for the payment of  Indebtedness in an aggregate amount of at least $50,000 is not paid when due or becomes or is declared to be due and payable prior to the expressed maturity thereof, or there shall have occurred an event which, with the giving of notice or lapse of time, or both, would cause any such obligation to become, or allow any such obligation to be declared to be, due and payable; or

(h) Bankruptcy, etc. Presidion or any of its Subsidiaries shall dissolve or liquidate or take an equivalent action or an involuntary petition shall have been filed under any federal or state bankruptcy, reorganization, insolvency, moratorium or some similar statute against Presidion or any of its Subsidiaries, or a custodian, receiver, trustee, assignee for the benefit of creditors or other similar official shall be appointed to take

13

possession, custody, or control of the property of Presidion or any of its Subsidiaries, unless such petition or appointment is set aside or withdrawn or ceases to be in effect within sixty (60) days from the date of said filing or appointment; or Presidion or its Subsidiaries shall admit in writing its inability to pay any of its debts as they mature, or shall file any petition or action for relief relating to any bankruptcy, reorganization, insolvency or moratorium law, or any other similar law or laws for the relief of, or relating to, debtors; or Presidion or any of its Subsidiaries shall make a general assignment for the benefit of creditors or enter into an agreement of composition with its creditors; or

(i) Change in Authority. Any material permit, license or other authority of any nature from any Governmental Body now or hereafter required (i) for the performance of Presidion under this Loan Agreement or any other Related Documents shall not be obtained or shall be revoked, withdrawn or withheld or otherwise failed to remain in full force and effect, or (ii) in the conduct of Presidion's business shall not be obtained or shall be revoked, withdrawn or withheld or otherwise failed to remain in full force and effect, in each case (i) and (ii), for 30 days after notice of such by Brentwood; or

(j) Judgments. Either (i) a judgment or order for the payment of money in excess of Fifty Thousand Dollars ($50,000) or its equivalent in another currency, or (ii) a temporary restraining order, preliminary or final injunction, order of specific performance or similar judgment, order or decree requiring Presidion or either of the Subsidiaries to take, or prohibiting them from taking, any action, if such order, injunction, judgment or decree would be reasonably likely to have a Material Adverse Effect, is entered against Presidion, either of the Subsidiaries or any of their respective assets, and such judgment, order, injunction or decree is not discharged or appealed and stayed within sixty (60) days of entry or imposition thereof.

Upon any Event of Default, and any such failure shall remain unremedied for three (3) days, Brentwood may terminate any or all of its obligations hereunder or under any Related Document. With respect to any Event of Default, (i) in any such event described in Section 8, all Obligations shall automatically be due and payable without notice or demand or any action whatsoever by Brentwood; and (ii) in all other Events of Default, Brentwood may, upon notice (of any nature allowed by law) to Presidion, declare all Obligations (or any part thereof), to be forthwith due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Presidion.

In addition, upon any Event of Default, Brentwood may without prior notice or demand, exercise any and all rights available to it under this Loan Agreement or any Related Document in equity or by applicable law. No action taken by Brentwood shall be deemed to be an election of remedies by Brentwood, it being the intent of the parties that Brentwood shall be entitled repeatedly to exercise all remedies separately or concurrently and in any manner allowed by law.

14

## ARTICLE 9.
## MISCELLANEOUS

Section 9.1    Notices, etc.    All notices, requests, demands or other communications which are required or may be given pursuant to the terms of this Loan Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of delivery if personally delivered by hand, (ii) upon the third day after such notice is (a) deposited in the United States mail, if mailed by registered or certified mail, postage prepaid, return receipt requested, or (b) sent by a nationally recognized overnight express courier, or (iii) by facsimile upon written confirmation (other than the automatic confirmation that is received from the recipient's facsimile machine) of receipt by the recipient of such notice:

If to Brentwood:        Brentwood Capital Corp.
                        477 Madison Avenue, 12th Floor
                        New York, New York 10022
                        Attention: Charles J. Spinelli
                        Facsimile No.: (212) 751-7611

With a copy to:         Levy Boonshoft & Spinelli, P.C.
                        477 Madison Avenue
                        New York, New York 10022
                        Attention: Peter Campitiello, Esq.
                        Facsimile No.: (212) 751-6943

If to Presidion:        Presidion Solutions, Inc.
                        755 W. Big Beaver Rd.
                        Troy, Michigan 48084
                        Attention: John W. Burcham, II
                        Facsimile No.: (866) 826-5666

With a copy to:         James E. Baiers, Esq.
                        755 W. Big Beaver Rd.
                        Troy, Michigan 48084
                        Facsimile No.: (866) 826-5666

Such addresses may be changed, from time to time, by means of a notice given in the manner provided in this Section 9.1.

Section 9.2 No Waiver; Remedies. No failure on the part of Brentwood to exercise, and no delay in exercising, any right under this Loan Agreement or any Related Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any of the aforesaid preclude any other or further exercise thereof or the exercise of any

other right from time to time and as often as Brentwood may deem expedient and without notice (except any notice which is specifically required by written agreement). The remedies provided in this Loan Agreement and the Related Documents are cumulative and not exclusive of any remedies provided by law or in equity, now or hereafter existing.

Section 9.3 Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with GAAP except as otherwise stated herein.

Section 9.4 Assignment. This Loan Agreement shall not be assignable by Presidion without Brentwood's Consent. Brentwood may sell, transfer, assign, negotiate, pledge, or hypothecate all or any portion of this Loan Agreement or the Security Agreement (except that if Brentwood assigns all of its rights under this Loan Agreement it shall also assign all of its rights under the Security Agreement) to any Person.

Section 9.5 Governing Law; Venue. This Loan Agreement and each Related Document shall be deemed to have been made in New York and the validity of such documents, their construction, interpretation and enforcement, shall be determined under, governed by and construed in accordance with the laws of New York. In any court proceeding, Presidion agrees to submit to the jurisdiction of the state or federal court selected by Brentwood, and venue of any action concerning this Loan Agreement or any Related Document shall be in the county of New York in the State of New York. Presidion hereby irrevocably waives to the fullest extent permitted by law any objection which it may now or hereafter have to the laying of such venue and any claim that any such forum is an inconvenient forum. Nothing in this Section shall impair the right of Brentwood to bring any action or proceeding against Presidion or its property in the courts of any other county or jurisdiction.

Section 9.6 Entire Loan Documents; Headings; Amendments; Severability; Time; Fair Construction; Counterparts. This Loan Agreement and the Related Documents constitute the entire agreement between the parties regarding the terms of this Loan and supersede any and all other agreements relating to the subject matter of this Loan Agreement and the Related Documents, oral or written, among any or all of the parties. The headings of the various sections and subsections of this Loan Agreement and of any Related Document are for convenience of reference only and do not constitute a part of the respective document and shall not affect the meaning or construction of any provision.

No amendment, waiver or forbearance of any provision of this Loan Agreement or of any Related Document shall be effective unless the same shall be in a writing signed by Brentwood. Any such waiver or forbearance shall only be effective for the specific purpose and in the specific instance given and not for other or subsequent purposes or instances and no forbearance or waiver shall affect Brentwood's right to refuse further forbearances or waivers. If any portion of this Loan Agreement or any Related Document is held to be invalid or unenforceable, the remaining portions and provisions and conditions thereof shall remain in full force and effect.

Time is of the essence under this Loan Agreement and each Related Document. Counsel for each party has participated in the review and revision of this Loan Agreement and each party agrees that the rules of construction requiring any ambiguities to be resolved against the drafting party shall not be employed in the interpretation of this Loan Agreement or any Related Document. The signature pages of this Loan Agreement and of any Related Document may be executed in counterparts.

Section 9.7 Confidentiality. Except as may be required to enforce the rights and duties established hereunder (including establishing and maintaining Brentwood's perfected Lien in the Collateral), the parties hereto shall preserve in a confidential manner all information received from the other pursuant to this Loan Agreement and the Related Documents, and shall not disclose such information except to those Persons with which a confidential relationship is maintained (including regulators, legal counsel, accountants, agents or an assignee or a prospective assignee of any of Brentwood's rights hereunder), or where required by law.

Section 9.8 No Waiver. Notwithstanding anything contained in this Loan Agreement, the execution and delivery of this Loan Agreement by Brentwood shall not constitute a waiver by Brentwood of any breach by Presidion of a representation, warranty, covenant or condition set forth in the Existing Loan Agreement.

Section 9.9 Incorporation by Reference. All of the Exhibits to this Loan Agreement are hereby incorporated into this Loan Agreement by reference.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement the day and year first above set forth.

PRESIDION SOLUTIONS, INC.

BY: _____
CRAIG VANDERBURG
CHIEF EXECUTIVE OFFICER

BRENTWOOD CAPITAL CORP.

BY: _____
CHARLES J. SPINELLI
PRESIDENT

O:\Brentwood Capital Corp\Presidion Solutions Loan Agreement 10-15-02.doc

17

# EXHIBIT C

## PROMISSORY NOTE

$5,700,000                                                      October 22, 2002
New York, New York

FOR VALUE RECEIVED, Presidion Solutions, Inc. a Michigan corporation ("Borrower"), hereby covenants and promises to pay to the order of Brentwood Capital Corp., a New York corporation (the "Holder"), Five Million Seven Hundred Thousand and 0/100 Dollars ($5,700,000.00), together with interest at the rate of seven and one-half (7.5%) per annum, in lawful money of the United States of America. All principal, interest and other costs hereunder shall be due and payable to the Holder of this Promissory Note (the "Note"), plus applicable accrued interest, on or before October 15, 2003 (the "Due Date").

Borrower shall have the right to prepay, without penalty, all or any part of the unpaid balance of this Note at any time on ten (10) days prior written notice; provided, however, that any partial prepayment shall be applied upon the installments of principal and interest in the inverse order of their becoming due, and upon making any such prepayment in full, Borrower shall pay to the Holder all interest owing pursuant to this Note. Borrower shall not be entitled to re-borrow any prepaid amounts of the principal, interest or other costs or charges. Borrower is duly authorized to enter into this Note. This Note may not be assigned without the Holder's prior written permission.

Further, it is agreed that if any installment of principal and/or interest on this Note is not paid when due, the entire unpaid portion of this Note and all sums payable hereunder may be declared immediately due and payable at the option of the Holder. After the maturity date of this Note, whether by acceleration or otherwise, interest shall accrue on the principal amount, and accrued interest thereon remaining unpaid at an interest rate equal to 15% per annum or the highest lawful rate, whichever is lower, until paid. All payments of principal and interest under this Note are to be made to the Holder in lawful currency of the United States and in immediately available funds to the Holder by wire transfer in immediately available funds to such bank account as the Holder or any assignee may designate in writing.

This Note is made pursuant to a Loan Agreement, dated as of October 22, 2002, by and among Borrower and the Holder (the "Loan Agreement").

Borrower and the Holder acknowledge that the Note is enforceable, valid and binding upon and by the parties hereto. If for any reason, any court authority or governmental entity declares this Note invalid, unlawful or against public policy, then, the parties hereto acknowledge that neither the obligation of the Borrower to repay the Note, nor any of the covenants, obligations or representations of the parties contained within the Purchase Agreement shall be affected by such declaration.

Borrower shall pay to the Holder, on demand, each cost and expense (including, without limitation, reasonable attorneys' fees and all costs of suit) incurred by the Holder in (a) collecting any of the outstanding principal of this Note, any interest owing pursuant to this Note and remaining unpaid, or any other amount owing by Borrower to the Holder pursuant to this Note and remaining unpaid or (b) preserving or exercising any right or remedy of the Holder pursuant to this Note.

automatically become due (a) if Borrower, any subsidiary or affiliate commences or has commenced against it any bankruptcy or insolvency proceedings, (b) if all or substantially all of the business, assets or interests of Borrower, any subsidiary or affiliate, are sold or transferred by Borrower in any manner, or (c) an event of default occurs under the Loan Agreement.

Failure or delay by the Holder in exercising, or a single or partial exercise of any power or right hereunder, shall not operate as a waiver thereof or of any other power or right or preclude any future exercise of that or any other power or right. A waiver of any power or right hereunder shall be in writing, shall be limited to the specific instance, and shall not be deemed a waiver of such power or right in the future, or a waiver of any other power or right.

This Agreement may only be amended, canceled or discharged, except upon satisfaction by the Borrower of the obligations herein, in a writing signed by parties herein. This Agreement shall be binding upon and inure to the benefit of (a) the heirs, executors and legal representatives of either Holder upon such Holder's death and (b) any successor of the Borrower. Any such successor of Borrower shall be deemed substituted for Borrower under the terms of this Note for all purposes. As used herein, "successor" shall include any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Borrower.

This Agreement shall be construed and interpreted in accordance with the laws of the State of New York without reference to conflict of laws principle. Venue for any action commenced by a party herein shall be proper if brought in the appropriate court of competent jurisdiction in the County of New York County, State of New York.

Dated:      New York, New York
            October 15, 2002


                              PRESIDION SOLUTIONS, INC.

                              By:

                              CRAIG VANDERBURG
                              CHIEF EXECUTIVE OFFICER

# EXHIBIT D

STOCK AND COLLATERAL PLEDGE AGREEMENT

THIS STOCK AND COLLATERAL PLEDGE AGREEMENT (the "**Agreement**") is entered into as of October 22, 2002, by and among (i) PRESIDION SOLUTIONS, INC. a Michigan corporation, its permitted successors and assigns ("**Presidion**") and JOHN W. BURCHAM, II, JAMES E. BAIERS and CRAIG VANDERBURG, Presidion's shareholder (collectively, "**Pledgor**"), (ii) BRENTWOOD CAPITAL CORP. a New York corporation (the "**Secured Party**"), and (iii) LEVY, BOONSHOFT AND SPINELLI, P.C. as Security Agent for the Secured Parties the ("**Security Agent**").

**WHEREAS,** Pledgor and the Secured Parties have entered into a Loan Agreement dated as of October 22, 2002 (the "**Loan Agreement**"), pursuant to which the Secured Party shall procure a letter of credit in favor of Presidion in the principal amount of $5,700,000 (the "**LOC**") pursuant to the terms and conditions set forth therein; and

**WHEREAS,** pursuant to the terms of the Loan Agreement, the Pledgor has an obligation to repay the Secured Party the sum of $427,500 for interest in the amount of nine percent of the face amount of the LOC; and

**WHEREAS,** further pursuant to the terms of the Loan Agreement, the Pledgor may be required to repay the principal amount of the LOC, together with interest, costs and fees, if the LOC is drawn upon (the "**Note**"); and

**WHEREAS,** as a condition precedent to the terms of the Loan Agreement, the Pledgor is required to execute and deliver this Agreement and to pledge hereunder the Collateral as hereinafter defined as security for the Obligations (as defined herein);

**WHEREAS,** the Secured Parties desire to designate Levy, Boonshoft and Spinelli, P.C., to act as the Security Agent with respect to the certain of the collateral and Levy, Boonshoft and Spinelli, P.C. is willing to act as the Security Agent hereunder; and

**WHEREAS,** all capitalized terms used herein which are not herein defined shall have the meanings ascribed to them in the Loan Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## I. DEFINITIONS

For the purposes of this Agreement:

1(a)    "**Event of Default**" means: (i) the events set forth in Section 8.1 of the Loan Agreement; (i) the failure of the Pledgor to timely repay the Note or a default of any of the terms of the Note; (iii) the failure of the Pledgor to pay certain of the

collateral set forth herein; (iv) the failure of the Pledgor to comply in any material respect with the requirements of the Loan Agreement following the Secured Parties' giving of notice to the Pledgor of such failure; (v) the assignment of the Note or any of the obligations thereunder by the Pledgor; (vi) the assignment, transfer, sale, hypothecation or pledge of the collateral; or (vii) the sale, transfer or hypothecation, for whatever reason, by the Pledgor of the assets of Presidion not in the ordinary course of business.

1(b)    "**Collateral**" means (i) all of the issued and outstanding shares of voting common stock of Presidion, subject to a senior pledge to Comerica Bank (and the certificates, copies of which are attached hereto, representing such shares) (the "**Stock Collateral**"), and (ii) the amount $5,700,000 Presidion is required to pay to the Secured Party in fifty-two (52) equal, weekly payments of $109,615 (the "**Cash Collateral**").

## II. SECURITY AGENT

The Secured Parties and Pledgor hereby appoint Levy, Boonshoft and Spinelli, P.C. the security agent hereunder for the Stock Collateral and authorize Levy, Boonshoft and Spinelli, P.C. accept delivery of the Collateral and to use, manage and dispose of the Stock Collateral as this Agreement provides, all for the benefit of Secured Parties, and Pledgor hereby agrees and consents to such appointment.

## III. PLEDGE OF COLLATERAL

### A. Stock Collateral

3(a) As security for the due and punctual payment and performance by Pledgor of all of their obligations under Section 2.1 of the Loan Agreement and the Related Agreements (the "**Secured Obligations**"), Pledgor hereby pledges and assigns to Security Agent, for the benefit of Secured Parties, all of the Stock Collateral, and grants to Security Agent, for the benefit of Secured Parties, a first priority security interest in the Stock Collateral and the proceeds thereof.

3(b)    Simultaneously with the execution of this Pledge Agreement, Pledgor is delivering to Security Agent certificates and other indicia representing the shares of Stock Collateral described in Section 1, hereof, all of which certificates shall be registered in the name of Pledgor, duly endorsed in blank or accompanied by stock powers duly executed by Pledgor in blank, together with any other documents necessary to cause Secured Party to have a good, valid and perfected first pledge of, lien on and security interest in the Stock Collateral, free and clear of any mortgage, pledge, lien, security interest, hypothecation, assignment, charge, right, encumbrance or restriction (individually, "**Encumbrance**" and collectively, "**Encumbrances**").    At any time following an Event of Default, and applicable opportunity to cure, any or all shares of the Stock Collateral held by Security Agent on behalf of Secured Parties hereunder may, at the option of Secured Party exercised in accordance with **Section V** hereof, be registered in the name of Security Agent or in the name of its nominee, and Pledgor hereby covenants that,

upon demand therefor by Security Agent, Pledgor shall cause the Pledgor to effect such registration.

3(c)    Security Agent hereby confirms receipt of the certificates representing the Stock Collateral and agrees to hold the Stock Collateral in accordance with the terms of this Agreement.

### B. Cash Collateral

3(d) As security for the due and punctual payment and performance by Pledgor of all of their obligations under Section 2.1 of the Loan Agreement and the Related Agreements (the **"Secured Obligations"**), Pledgor hereby pledges and assigns to Secured Party, all of the Cash Collateral, to be held in escrow by the Secured Party, and grants to Secured Party the right to liquidate the Cash Collateral as set forth herein upon an Event of Default.

3(e) Upon satisfaction by Presidion of the terms of the Secured Obligations, the Cash Collateral shall be returned to Presidion according to its written instructions.

### IV.  VOTING RIGHTS, DIVIDENDS AND DISTRIBUTIONS

So long as no Event of Default shall have occurred and be continuing:

4(a)    Pledgor shall be entitled to exercise any and all voting and/or consensual rights and powers relating or pertaining to the Collateral or any part thereof, subject to the terms hereof.

4(b)    Pledgor shall be entitled to receive and retain cash dividends payable on the Collateral to which it is entitled to receive and retain under the Exchange Agreement and the Documents; provided, however, that all other dividends (including, without limitation, stock and liquidating dividends), distributions in property, returns of capital and other distributions made on or in respect of the Collateral, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of the Companies or received in exchange for the Collateral or any part thereof or as a result of any merger, consolidation, acquisition or other exchange of assets to which the Companies may be a party or otherwise, and any and all cash and other property received in exchange for or redemption of any of the Collateral, shall be retained by Security Agent, or, if delivered to Pledgor, shall be held in trust for the benefit of Secured Party and forthwith delivered to Security Agent and shall be considered as part of the Collateral for all purposes of this Agreement.

4(c)    Security Agent shall execute and deliver (or cause to be executed and delivered) to Pledgor all such proxies, powers of attorney, dividend orders, and other instruments as Pledgor may request for the purpose of enabling Pledgor to exercise the voting and/or consensual rights and powers which Pledgor is entitled to exercise pursuant to Section 4(a) above and/or to receive the dividends which Pledgor is authorized to receive and retain pursuant to Section 4(b) above; and Pledgor shall execute and deliver to Security Agent such instruments as may be required or may be requested by Security Agent to enable Security Agent to receive and retain the

dividends, distributions in property, returns of capital and other distributions it is authorized to receive and retain pursuant to Section 4(b) above.

4(d)    Upon the occurrence and during the continuance of an Event of Default, all rights of Pledgor to exercise the voting and/or consensual rights and powers which Pledgor is entitled to exercise pursuant to Section 4(a) above and/or to receive the dividends which Pledgor is authorized to receive and retain pursuant to Section 4(b) above shall cease, at the option of Security Agent (if so directed by Secured Parties), on not less than one (1) day's notice to Pledgor, and all such rights shall thereupon become vested in Security Agent, who shall have the sole and exclusive right and authority to exercise such voting and/or consensual rights and powers and/or to receive and retain such dividends. In such case Pledgor shall execute and deliver such documents as Security Agent may request to enable Security Agent to exercise such rights and receive such dividends. In addition, Security Agent is hereby appointed the attorney-in-fact of Pledgor, with full power of substitution, which appointment as attorney-in-fact is irrevocable and coupled with an interest, to take all such actions after the occurrence and during the continuance of an Event of Default, whether in the name of Security Agent or Pledgor, as Security Agent may consider necessary or desirable for the purpose of exercising such rights and receiving such dividends. Any and all money and other property paid over to or received by Security Agent pursuant to the provisions of this Section 4(d) shall be retained by Security Agent as part of the Collateral and shall be applied in accordance with the provisions hereof.

## V. REMEDIES OF DEFAULT

### A. Stock Collateral

(a)    If at any time an Event of Default shall have occurred and be continuing, then, in addition to having the right to exercise any right or remedy of a Secured Parties upon default under the Uniform Commercial Code as then in effect in the jurisdiction in which the Stock Collateral is held by Security Agent, Security Agent shall, if directed to do so by Secured Parties, to the extent permitted by law, without being required to give any notice to Pledgor except as provided below:

(i)    Collect, receive, appropriate and realize upon the Stock Collateral or any part thereof, and/or, if so directed by Secured Parties, retain the Collateral and deliver the Stock Collateral to the Secured Parties for the ownership of the Secured Parties;

(ii) Collect, receive, appropriate and realize upon the Stock Collateral or any part thereof, and/or, if so directed by the Secured Parties, sell, assign, contract to sell or otherwise dispose of and deliver the Stock Collateral or any part thereof, in its entirety or in portions, at public or private sale or at any broker's board, on any securities exchange or at any of Security Agent's places of business or elsewhere, for cash, upon credit or for future delivery, and at such price or prices as Security Agent may deem best, and Security Agent or Secured Parties may (except as otherwise provided by law) be the purchaser of any or all of the Stock Collateral

so sold and thereafter may hold the same, absolutely, free from any right or claim of whatsoever kind.

On any private sale of the Stock Collateral, Security Agent is hereby required to grant Pledgor not less than ten (10) days' prior notice of said sale along with the proposed terms of the sale. The Secured Party hereby grants the Pledgor a non-assignable right of first refusal to meet the terms of any private sale. If the Pledgor does not meet the terms of the private sale within ten (10) days after the notice period, the Security Agent shall have the right to proceed with the private sale.

In the event of a sale as aforesaid, Security Agent is authorized to, at any such sale, if it deems it advisable so to do, restrict the number of prospective bidders or purchasers and/or further restrict such prospective bidders or purchasers to persons who will represent and agree that they are purchasing for their own account, for investment, and not with a view to the distribution or resale of the Stock Collateral, and may otherwise require that such sale be conducted subject to restrictions as to such other matters as Security Agent may deem necessary in order that such sale may be effected in such manner as to comply with all applicable state and federal securities laws. Upon any such sale, Security Agent shall have the right to deliver, assign and transfer to the purchaser thereof the Stock Collateral so sold.

Pledgor hereby acknowledges that, notwithstanding that a higher price might be obtained for the Stock Collateral at a public sale than at a private sale or sales, the making of a public sale of the Collateral may be subject to registration requirements under applicable securities laws and similar other legal restrictions compliance with which would require such actions on the part of Pledgor, would entail such expenses, and would subject Security Agent, any underwriter through whom the Stock Collateral may be sold and any controlling person of any of the foregoing to such liabilities, as would make a public sale of the Collateral impractical. Accordingly, Pledgor hereby agrees that private sales made by Security Agent in good faith in accordance with the provisions of this Section 5(a) may be at prices and on other terms less favorable to the seller than if the Stock Collateral were sold at public sale, and that Security Agent shall not have any obligation to take any steps in order to permit the Stock Collateral to be sold at public sale, a private sale being considered or deemed to be a sale in a commercially reasonable manner.

Pledgor also hereby acknowledges that any private sale of the Stock Collateral may be subject to compliance with federal and state securities laws. In the event that the applicable requirements under the Securities Act of 1933 cannot be satisfied at the time of a proposed sale of the Stock Collateral by Security Agent, Pledgor hereby agrees to substitute for the Stock Collateral other property owned by the Pledgor, free and clear of all Encumbrances, of at least equal value as the Collateral as of the date of such proposed sale.

Each purchaser at any such sale shall hold the property sold, absolutely, free from any claim or right of whatsoever kind, including any equity or right of redemption of Pledgor, who hereby specifically waives all rights of redemption, stay or appraisal which Pledgor has or may have under any rule of law or statute now existing or hereafter adopted. Security Agent shall give Pledgor not less than five (5) days' written notice of its intention to make any such public or private sale. Such

notice, in case of a public sale, shall state the time and place fixed for such sale, and, in case of a sale at broker's board, on a securities exchange, at one or more of Security Agent's places of business or elsewhere, shall state the board, exchange or other location at which such sale is to be made and the day on which the Stock Collateral, or that portion thereof so being sold, will first be offered for sale at such location. Such notice, in case of a private sale, shall state only the date on or after which such sale may be made. Any such notice given as aforesaid shall be deemed to be reasonable notification.

Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Security Agent may fix in the notice of such sale. At any sale the Stock Collateral may be sold in one lot as an entirety or in parts, as Security Agent may determine. Security Agent shall not be obligated to make any sale pursuant to any such notice. Security Agent may, without notice or publication, adjourn any sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned. In case of any sale of all or any part of the Stock Collateral on credit or for future delivery, the Stock Collateral so sold may be retained by Security Agent until the selling price is paid by the purchaser thereof, but neither the Security Agent nor Secured Parties shall incur any liability in case of the failure of such purchaser to take up and pay for the Stock Collateral so sold and, in case of any such failure, such Stock Collateral may again be sold upon like notice.

Security Agent, instead of exercising the power of sale herein conferred upon it, may proceed by a suit or suits at law or in equity to foreclose its lien or security interest arising from this Agreement and sell the Stock Collateral, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

Upon the occurrence of an Event of Default, Security Agent or his nominee shall have the right, upon not less than one (1) day's notice to Pledgor, to exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any shares of the Stock Collateral as if it were the absolute owner thereof, including, without limitation, the right to exchange, at its discretion, any or all of the Stock Collateral upon the merger, consolidation, reorganization, recapitalization or other readjustment of Presidion, or upon the exercise by Presidion of any right, privilege or option pertaining to any such shares of the Stock Collateral, and, in connection therewith, to deposit and deliver any and all of the Stock Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Security Agent may determine.

On any sale of the Stock Collateral, Security Agent is hereby authorized to comply with any limitation or restriction in connection with such sale that it may be advised by counsel is necessary in order to avoid any violation of applicable law or in order to obtain any required approval of the purchaser or purchasers by any governmental regulatory authority or officer or court.

It is expressly understood and agreed by Pledgor that Security Agent may proceed against all or any portion or portions of the Stock Collateral and all other

collateral securing the Secured Obligations in such order and at such time as Security Agent, in his sole discretion, sees fit; and Pledgor hereby expressly waives any rights under the doctrine of marshalling of assets.

Compliance with the foregoing procedures shall result in such sale or disposition being considered or deemed to have been made in a commercially reasonable manner.

5(b)    Each of the rights, powers, and remedies provided herein, in the Agreement or any other Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for herein or therein or now or hereafter existing at law or in equity or by statute or otherwise. The exercise of any such right, power or remedy shall not preclude the simultaneous or later exercise of any or all other such rights, powers or remedies. No notice to or demand on Pledgor in any case shall entitle Pledgor to any other notice or demand in similar or other circumstances.

5(c)    All actions taken by Security Agent in the exercise of the remedies set forth herein shall be for the benefit of Secured Parties.

## VI. REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

6(a)    Pledgor represents, warrants and covenants that:

(i)    Pledgor is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the full legal power and authority to own the Collateral and to execute, deliver and perform this Pledge Agreement.

(ii)    The execution, delivery and performance of this Pledge Agreement has been duly and validly authorized by all necessary actions on the part of Pledgor (none of which actions have been modified or rescinded, and all of which actions are in full force and effect). This Pledge Agreement has been duly executed and delivered by Pledgor and constitutes a legal, valid, and binding obligation of Pledgor, enforceable in accordance with its terms.

(iii)    Pledgor is or, with respect to the Collateral described in Section 1 hereof, not later than the time of delivery of certificates therefor will be, the direct record and beneficial owner of each share of the Collateral. Pledgor has and will have good, valid and marketable title thereto, free and clear of all Encumbrances other than the security interest created by this Agreement.

(iv)    The Collateral is and will be duly and validly pledged to Security Agent for the benefit of Secured Parties in accordance with law, and Security Agent has, for the benefit of Secured Parties, a good, valid, and perfected first lien on and security interest in the Collateral and the proceeds thereof.

(v)    The execution, delivery and performance by Pledgor of this Pledge Agreement does not and will not:  (A) conflict with or violate the Certificate of Incorporation or By-Laws of Pledgor; (B) conflict with or result in a breach of or constitute a default or require any consent under, or result in or require the acceleration of any of its indebtedness pursuant to, any agreement, indenture or other instrument to which Pledgor is a party or by which Pledgor or any of its properties may be bound or affected; or (C) conflict with or violate any judgment, decree, order, law, statute, ordinance, license or other governmental rule or regulation applicable to Pledgor.

(vi)    No approval, consent or other action by Pledgor, any governmental authority, or any other person or entity is or will be necessary to permit the valid execution, delivery or performance of this Pledge Agreement by Pledgor.

(vii)    There is no action, claim, suit, proceeding or investigation pending, or to the knowledge of Pledgor, threatened or reasonably anticipated, against or affecting Pledgor, this Pledge Agreement, or the transactions contemplated hereby, before or by any court, arbitrator or governmental authority which might adversely affect Pledgor's ability to perform its obligations under this Pledge Agreement.

6(b)    Until all Secured Obligations have been performed in full or until all of the Collateral is returned to Pledgor pursuant to this Pledge Agreement, whichever is earlier, Pledgor hereby covenants that, unless Secured Parties otherwise consents in advance in writing:

(i)    Pledgor shall:  (A) at the request of Secured Parties, execute, deliver, and file any and all financing statements, continuation statements, stock powers, instruments, and other documents necessary or desirable, in Secured Parties' opinion, to create, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Security Agent for the benefit of Secured Parties and Security Agent's lien on and security interest in the Collateral and the first priority thereof; (B) maintain or cause to be maintained at all times, the pledge of the Collateral to Security Agent for the benefit of Secured Parties and Security Agent's lien on and security interest in the Collateral and the first priority thereof; and (C) defend the Collateral and Security Agent's interest therein against all claims and demands of all persons at any time claiming the same or any interest therein adverse to Security Agent, and pay all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) in connection with such defense.

(ii)    Pledgor shall not sell, transfer, pledge, assign or otherwise dispose of any of the Collateral or any interest therein, and Pledgor shall not create, incur, assume or suffer to exist any Encumbrance with respect to any of the Collateral or any interest therein (except pursuant hereto).

(iii)    Following any Event of Default, Pledgor shall disclose to Secured Parties all material adverse information known by it with respect to the Companies which has not been publicly disclosed, and Pledgor hereby authorizes Security Agent to make public all such information prior to any sale of or foreclosure on the Collateral after an Event of Default shall have occurred.

(iv)    Pledgor shall:  (A) cause the Companies to preserve and maintain its existence in good standing;  (B) cause the Companies to comply with the requirements of all applicable laws, rules, regulations and orders of all applicable governmental authorities, including, but not limited to, the listing requirements of the National Association of Securities Dealers and the Securities and Exchange Commission, as applicable, a breach of which might materially adversely affect the value of the Collateral;  (C) give written notice to Secured Parties within five (5) Business Days after learning of (1) any action, suit or proceeding instituted or threatened against the Companies in any Federal, state or foreign court or before or by any commission or other regulatory body (Federal, state or local, domestic or foreign), an adverse determination in which may reasonably be expected to lead to or to result in a material adverse effect upon the value of the Collateral, (2) the filing, recording or assessment of any Federal, state, local or foreign tax lien against the Companies, an adverse determination in which may lead to or result in a material adverse effect upon the value of the Collateral, (3) the occurrence of any Event of Default or event which, with the passage of time or giving of notice would constitute an Event of Default, hereunder, or (4) a material default under any other agreement, instrument or indenture to which the Companies is a party or by which the Companies or the Collateral may be bound or subject.

(v)    Pledgor shall cause the Companies to pay all debts and perform all obligations promptly and in accordance with the terms thereof and pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon the Companies or upon the Collateral before the same shall become past due.

(vi)    Pledgor shall not take or permit to be taken any action in connection with the Collateral or otherwise which would impair the interests or rights of Security Agent or Secured Parties therein or with respect thereto, including, without limitation, any amendment to or modification of the Certificate of Incorporation or By-Laws of the Companies which would impair the interests or rights of Security Agent or Secured Parties with respect to the Collateral.

## VII. RESPONSIBILITIES OF SECURITY AGENT

7(a)    Security Agent shall use reasonable care in the custody and preservation of the Collateral.  Security Agent shall act under this Agreement solely as Security Agent for Secured Parties.  Security Agent shall not be responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the stock certificates or other documents in its possession, or for the form or execution thereof, or for the identity or authority of any person executing or depositing them with Security Agent.

7(b)    Security Agent shall be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which Security Agent in good faith believes to be genuine.

7(c)    Security Agent shall not be liable for any action taken or omitted by him except in the case of its negligence or bad faith, and may consult with counsel of its

- 9 -

own choice and shall have full and complete authorization and protection for any action taken or suffered by him hereunder in good faith and in accordance with the opinion of such counsel.

7(d)    Security Agent shall be required to take any action permitted to be taken by him hereunder which he is directed to take in a written notice from Secured Parties and shall not be required to take any action which is not permitted to be taken by him hereunder or which Secured Parties has directed him not to take in a written notice.

7(e)    Security Agent covenants that he will not create, incur, assume or suffer to exist any Encumbrances of any nature on any of the Collateral arising from his own acts, except as is specifically authorized in this Agreement.

7(f)    Security Agent shall not be required to make any investigation or inquiry as to the existence of any Event of Default or event which, with the passage of time or giving of notice would constitute an Event of Default, but for all purposes of this Agreement shall conclusively rely, notwithstanding any notice by Pledgor to the contrary, as to the existence or nonexistence of any such Event of Default or other event, on a written notice from Secured Parties delivered to Security Agent, when accompanied by Secured Parties' written certificate that Secured Parties has delivered a copy of such notice (in the manner provided in **Section 1(a)** hereof) to Pledgor; but no such written notice shall constitute any waiver, estoppel or admission by Secured Parties to Pledgor. Security Agent shall give prompt telephonic notice (confirmed by notice in writing) or notice by facsimile to Secured Parties of any failure by Pledgor to comply with any of the provisions of this Agreement of which Security Agent has knowledge.

## VIII. RETURN OF COLLATERAL

So long as no Event of Default has occurred, upon the termination of the right of the Secured Parties to acquire all of the outstanding shares of the Companies from the Pledgor and all other Secured Obligations have been paid, performed and satisfied in full, this Pledge Agreement shall terminate and the Collateral held by Security Agent shall promptly (after notification of such payment and performance to Security Agent from Secured Parties) be returned to Pledgor at the address of Pledgor set forth herein or at such other address as Pledgor may direct in writing. Neither Security Agent nor Secured Parties shall be deemed to have made any representation or warranty with respect to any Collateral so delivered, except that such Collateral is free and clear, on the date of delivery, of any and all liens, charges and encumbrances arising from its own acts.

## IX. ADDITIONAL ACTIONS AND DOCUMENTS

Pledgor hereby agrees to take or cause to be taken such further actions (including, without limitation, the delivery of certificates for all of the Companies' shares hereafter acquired by the Pledgor), to execute, deliver and file or cause to be executed, delivered and filed such further documents and instruments, and to obtain such consents as may be necessary or desirable, in the opinion of Secured Parties,

in order to fully effectuate the purposes, terms and conditions of this Agreement, whether before, at or after the occurrence of an Event of Default.

## X. SURVIVAL

It is the express intention and agreement of the parties hereto that all covenants, agreements, statements, representations, warranties and indemnities made by Pledgor herein shall survive the execution and delivery of this Agreement until performance in full of the Secured Obligations.

## XI. ENTIRE AGREEMENT

This Pledge Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein.

## XII. NOTICES

All notices, demands, consents, requests, and other communications required or permitted to be given or made hereunder shall be in writing and shall be delivered, telecopied, telexed or mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or transmitted by hand delivery, addressed as follows:

| | |
|---|---|
| If to Secured Party: | Brentwood Capital Corp.<br>477 Madison Avenue, 12th Floor<br>New York, New York 10022<br>Attention: Charles J. Spinelli<br>Facsimile No.: (212) 751-7611 |
| With a copy to: | Levy Boonshoft & Spinelli, P.C.<br>477 Madison Avenue<br>New York, New York 10022<br>Attention: Peter Campitiello, Esq.<br>Facsimile No.: (212) 751-6943 |
| If to Pledgor: | Presidion Solutions, Inc.<br>755 W. Big Beaver Rd.<br>Troy, Michigan 48084<br>Attention: John W. Burcham, II<br>Facsimile No.: (866) 826-5666 |
| With a copy to: | James E. Baiers, Esq.<br>755 W. Big Beaver Rd.<br>Troy, Michigan 48084<br>Facsimile No.: (866) 826-5666 |

Each party may designate by notice in writing a new address to which any notice, demand, request or communication may thereafter be so given, served or sent. Each notice, demand, request or communication which shall be given or made in the manner described above shall be deemed sufficiently given or made for all purposes at such time as it is hand-delivered to the addressee (with the delivery receipt or statement of messenger being deemed conclusive, but not exclusive, evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation or three (3) days after being deposited in the mails, as applicable.

## XIII. AMENDMENT

No amendment, modification or supplement of or to this Agreement shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification or supplement is sought.

## XIV. BENEFIT AND ASSIGNMENT

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement may not be assigned by Pledgor.

## XV. WAIVER

No delay or failure on the part of Security Agent or Secured Parties in exercising any right, power or privilege under this Agreement or under any other instruments given in connection with or pursuant to this Agreement shall impair any such right, power or privilege or be construed as a waiver of any default or any acquiescence therein. No single or partial exercise of any such right, power or privilege shall preclude the further exercise of such right, power or privilege, or the exercise of any other right, power or privilege. No waiver shall be valid against Security Agent or Secured Parties unless made in writing and signed by Security Agent or Secured Parties, as the case may be, and then only to the extent expressly specified therein.

## XVI. SEVERABILITY

If any part of any provision of this Agreement or any other agreement, document or writing given pursuant to or in connection with this Agreement shall be invalid or unenforceable in any respect, such part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining provisions of this Agreement.

## XVII. GOVERNING LAW

This Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the State of New York.

## XVIII.  PRONOUNS

All pronouns and any variations thereof in this Agreement shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or entity may require.

## XIX.  HEADINGS

Section headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

## XX.  EXECUTION

To facilitate execution, this Agreement may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures of, or on behalf of, each party, or that the signatures of all persons required to bind any party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each party, or that the signatures of the persons required to bind any party, appear on one or more of the counterparts. All counterparts shall collectively constitute a single agreement. It shall not be necessary in making proof of this Agreement to produce or account for more than that number of counterparts containing the respective signatures of, or on behalf of, all of the parties hereto.

## XXI.  SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF

The parties hereto agree that the provisions of this Agreement may be specifically enforced. Pledgor agrees that the Secured Parties (or the Security Agent on their behalf) shall be entitled, in addition to any other remedies they may have under this Agreement or otherwise, to preliminary and permanent injunctive and other equitable relief to prevent or curtain any breach of this Agreement by Pledgor.

*(The rest of this page left intentionally blank.)*

**IN WITNESS WHEREOF,** each of the parties hereto has duly executed this Agreement, or has caused this Agreement to be duly executed on its behalf, as of the day and year first above written.

PLEDGOR:

PRESIDION SOLUTIONS, INC.

By: _____

CRAIG VANDERBURG
CHIEF EXECUTIVE OFFICER

_____
CRAIG VANDERBURG

_____
JAMES E. BAIERS

_____
JOHN W. BURCHAM, II

SECURED PARTIES:

BRENTWOOD CAPITAL CORP.

By: _____

CHARLES J. SPINELLI
PRESIDENT

SECURITY AGENT:

LEVY BOONSHOFT & SPINELLI, P.C.

By: _____

O:\Brentwood Capital Corp\Presidion Solutions Collateral Pledge 10-15-02.DOC

- 15 -

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     )  ss.:
COUNTY OF NEW YORK   )

YOSEF Y. WEINTRAUB, being duly sworn, deposes and says:

I am not a party to this action, I am over 18 years of age and reside in Staten Island, New York.

On May 31, 2006, I served the within **Notice of Motion** upon:

Richard E. Berman, Esq.
Berman, Kean & Riguera, P.A.
2101 W. Commercial Blvd., Suite 2800
Fort Lauderdale, FL 33309
reb@bermankean.com

at the foregoing address designated by said party for that purpose, by depositing a true copy of same enclosed in a post paid properly addressed wrappers in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York **and via email at the email address set forth above.**

_____
YOSEF Y. WEINTRAUB

Sworn to before me this
31st day of May, 2006

_____
Notary Public

ROBIN MAZZIA
**NOTARY PUBLIC,** STATE OF NEW YORK
NO. 01MA4726498
**QUALIFIED IN QUEENS COUNTY**
**COMMISSION EXPIRES** 6/30/06 .